No. 32,084

W. J. DYER, *Appellee,* v. LEE SCOTT and WILBUR L. SCOTT, *Appellants.*

(41 P. 2d 993)

Opinion filed March 9, 1935.

*John O. Morse,* of Mound City, for the appellants.

*Harry W. Fisher,* of Fort Scott, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action in the district court was one to determine boundary, and for other relief.

Defendant, a recent purchaser of land, built a fence thirty-three feet over on what had been assumed to be his neighbor's land. Plaintiff, who claimed benefit of the same kind of conduct, exhibited with respect to defendant's land, prayed for an injunction. Defendant countered with prayer to quiet title. The district court could satisfy neither of them, and both appeal.

The land lies in a bend of the Marais des Cygnes river, which the government survey treated as if navigable. In 1876, in a partition suit referred to as *Davis v. Pratt,* tracts were assigned to Davis and to Pratt as shown on a plat, part of the record of the case, and filed in the office of the register of deeds. The following plat was made from the original, a photograph of which is before the court. The plat here exhibited is not accurate, but will serve to visualize the scene of the controversy.

464

SCHEDULE "A"

The plat shows two channels of the river surrounding an island. When partition was made between Davis and Pratt, water flowed in both channels. Since then, water has ceased to flow in the north channel. Both parties alleged the cessation was not gradual. There was no evidence on the subject, and as the pleadings stand, the fact is admitted. Since the cessation of flow was not by gradual reliction and accretion, neither boundary nor title was affected. While the old channel and the island are now cultivated, the right by which they are cultivated was not determined by the judgment, and the fact is of no consequence in solution of the boundary question.

Dyer traces title to tracts H and J through Hutchins, his immediate vendor, and through Creager, to Davis. Scott traces title to tracts I and K through Croxton's heirs, and through Croxton, to Pratt.

The original plat and the one reproduced above show that tract K lay in a loop of the river, and occupied the entire loop, plus a small quantity on the west side of the tract. Dyer claims all of that part of the loop lying south of a line formed by extending the north boundary of tract J eastward, entirely across the south part of the loop, to the river above the division of the channel.

The original plat purported to bound each tract. Tract H was bounded by straight lines. Tracts I, J and K were bounded by straight lines and by the river. There was no line drawn across the south part of the loop, and all of the loop belonged to tract K. While lines were not marked on the ground, they were marked on a paper representing the ground, and the absence of a line across the loop is conclusive against Dyer.

Dyer invokes a rule of interpretation, appropriate in cases of uncertainty, to ascertain the meaning of a plat which can be understood, so far as Dyer's claim to part of tract K is concerned, by simply looking at the plat. Generally the bank of a stream is considered as extending from the top of the bank, down to the water, which moves or rests on the stream bed. In the notes describing tract J, the call was from a point forming the southwest corner of tract H, east 18.14 chains to the right bank of the river. The plat shown above indicates the line would reach the water in the north part of the north channel. The original plat makes the line just touch the northernmost point of the north channel. The argument is, the line could not touch water at that point, and so to satisfy a

call of 18.14 chains to a river bank, the line would have to go about a quarter of a mile farther, across tract K, to get to a river bank, that is, to water. The draftsmen of the original plat stopped the north line of tract J at a place on the river which would make all of tract J, containing 18.17 acres, lie west of the north channel, and would make all the land in the river loop a part of tract K, containing 13.87 acres.

The distance from the southwest corner of tract H to the bank of the river, is given on the original plat as 18.14 chains. On the plat shown above, the distance is given as 18.44 chains, which seems to be the true distance. The discrepancy is not material in interpretation of the plat. The river bank was a monument as much as a stone. There was a river bank 30 links away, and if there were nothing else to show what the plat meant, the line would not be extended about twenty chains to reach another river bank.

The proposed interpretation would require a line to be drawn on the plat which is not there, would exaggerate distance, would distort the tracts in form and size, and is altogether inadmissible.

Dyer also claimed the south part of tract K by adverse possession. There was abundant proof that while the land was owned by Croxton's heirs, and until 1921, it was farmed down to the river. In that year, Hutchins, owner of tracts H and J, put a fence across tract K about on a line formed by extending the north boundary of tract J, eastward. Hutchins sold to Dyer in 1928. Scott purchased of Croxton's heirs in 1930. In 1932 Scott removed the fence, put it at a place which suited him, and farmed down to the river. The result is, the adverse possession lasted but eleven years.

The judgments in some actions to quiet title were introduced in evidence. The judgments, however, quieted title to tracts as described in *Davis v. Pratt*, and are of no assistance in determining boundaries.

After partition between Davis and Pratt, a boundary in fact between tract I on the north and J on the south was marked in a manner to be discussed later. After Scott became owner of tract I, he erected a fence thirty-three feet south of the apparent boundary. This occasioned the present litigation. On July 20, 1933, the court returned findings of fact and conclusions of law intended to be adverse to Dyer's claim respecting tract K, and adverse to Scott's claim respecting the boundary between tracts I and J, and rendered judgment. Scott's motion for a new trial was denied on October 5,

1933, and Scott appealed. Dyer read the judgment as giving him the part of tract K which he now claims, and Scott filed a motion to clarify the judgment, stating specifically how that should be done. The motion was allowed, and the introductory portion of the order reads:

"On this 2d day of April, 1934, this matter comes up for hearing upon the motion of the defendant, Wilbur L. Scott, for an order clarifying the findings and judgment of the court, rendered and entered herein on the 20th day of July, 1933, by inserting certain words in said findings and judgment.

"And it appearing to the court that there is some misunderstanding as to the meaning of the judgment of the court as now filed and recorded, and that the insertion of the words as asked in said motion will make such findings and judgment more clearly express the actual findings and judgment of the court, the court finds that said motion should be granted."

The order then adopted the suggested changes, making it clear Scott owned tract K, as shown on the plat. Dyer appealed.

Dyer contends that at a term subsequent to that at which judgment was rendered, and after an appeal from the judgment had been taken to this court, the district court simply changed its judgment to deprive Dyer of a portion of tract K given him by the judgment. This court regards the later action of the district court as simply making the record speak the truth. That may be done at any time.

Besides what has been said, Scott appealed from the order denying his motion for a new trial. One ground of the motion was, the judgment and findings of the court were unsupported by evidence. One assignment of error is, that the district court erred in denying the motion for a new trial. Interpreting the judgment as Dyer interprets it, the subject of soundness of the judgment is before this court, and this court would not permit such a judgment to stand.

We now reach the meritorious feature of the controversy, the boundary between tracts I and J. The court made the following findings of fact:

"4th. The evidence in this case fairly and most conclusively shows that as far back as the memory of any witness extends, a fence has been maintained at least a part of the time separating lots H and I from lot J, and trees and brush grew up along the strip of ground where the fence was usually erected, and that stumps of trees and good-sized trees, brush and a kind of fence for many years, and at this time, indicate and mark a strip of ground running east and west up to which owners of lots H and I farmed their land on the north side and the owner of lot J on the south side farmed his land, and the true east-and-west line separating lots H and I on the north from lot

J on the south is along the center part of this strip of land, as indicated by the trees, stumps, brush and fence, . . .

"6th. That the plaintiff (Dyer) and his immediate grantors have occupied and held possession and farmed all of lot J on the south side of the true line between lots I and J as fixed in finding No. 4 above, and has held and occupied said lot, notoriously and adversely under claim of title for more than thirty years, and is now in possession of said lot."

Scott contends the findings, except with respect to existence of an old fence, and use of land up to the fence, are not sustained by evidence.

Dyer testified as follows:

"I am the plaintiff in this action. Am sixty-four years of age, and am the owner of lots H and J, sec. 5, twp. 20, range 24. Bought same from I. N. Hutchins in 1928. Have been over the land and along the river ever since I was a boy. As far as I knew, when I bought this land Croxton owned lots I and K, now owned by the defendant. Croxton had been in apparent ownership for about 35 years. When I bought the land there were old trees along the north-and-south line between lots H and I, some thirty-five or forty feet high, and an old barb-wire fence, and some woven wire. The fence line between I and J was probably the same as to brush, only not so dense. Large trees here and there, and some chopped off. Straggling old wire fence and old posts where brush did not hold it up. The fence between lots J and I must have been maintained there quite a while. My first recollection is that there was timber here and there, and afterwards the Croxton part was cleared off and farmed, probably fifty-five or fifty years ago. In a general way I was familiar with ownership and conditions of land and fencing back that far."

Smith, a witness for Dyer, testified as follows:

"When Dyer bought land, there was good-sized trees along line between lots I and J, and old wire fence in middle of trees. Wire grown into trees. Some trees two feet around."

As indicated above, Dyer's chain of title was from Davis to Creager, to Hutchins, to Dyer. John Creager, son of the former owner of tracts H and J, was born on the land in 1883, and lived there until 1904, when he became of age. As a witness for Scott, John Creager testified as follows:

"My father never claimed to own any part of lot I. Wherever the fence was between lots J and I, my father always considered it as on the line between said lots."

Dyer gave it as his opinion that the line extended eastward from the southeast corner of tract I—just touched the top of the bank of the north channel of the river.

Gowing, sixty-nine years old, was familiar with the Croxton and Creager land. As a witness for Scott, Gowing testified there was

a swimming hole in the north bend of the old north channel where he went swimming when a boy. He farmed the Croxton land, tracts I and K, for sixteen years, and the line between I and J, if extended, would strike the north bend in the center of the river.

There was testimony that when the fence was built across tract K it was built on a straight line with the old fence on the south of tract I. Pierce, who helped build the fence, testified it was bellied around the point to the north. Toward the west the old fence was in bad shape and it was rebuilt.

Since 1876 tracts H and J have at no time been separately owned by different owners. The same is true of tracts I and K, and the court was in error in finding there was an old fence between tracts H and J. There was a north-and-south fence between H and I.

In 1932 a survey was made, on proper notice, which located the true line between tracts I and J thirty-three feet south of the old fence line. There was no appeal, and acting on the survey, Scott built the fence, maintenance of which Dyer sought to enjoin.

The foregoing includes the substance of all the testimony of any importance bearing on the subject of boundary in fact between tracts I and J. The result is, there was no testimony to support the court's judgment regarding boundary between tracts I and J, or regarding adverse possession of those tracts up to that boundary, except existence of the old fence, and use of land up to the fence.

John Creager's testimony refuted adverse possession by Dyer's predecessors in interest before 1911, when Hutchins became owner of tract J. If John Creager's testimony be rejected, there is nothing to show that Creager had any purpose to claim and adversely hold any of Croxton's land. There is nothing to indicate Hutchins' attitude toward boundary until 1921, when he built the fence across tract K and rebuilt the old fence in disrepair between tracts I and J. On the other hand, whoever built the old fence, and whenever it was built, there is no evidence that the builder intended to relinquish thirty-three feet of land, if the fence were not on the true line.

The opinion in the case of *Kinne v. Waggoner*, 108 Kan. 814, 197 Pac. 195, contains the following:

"It is no longer an open question in this state that adjacent landowners are not estopped to dispute the accuracy of a boundary line which by mistake they have long treated as such, nor does the occupancy of land beyond the true boundary line by an encroaching owner form a basis for adverse possession unless the encroachment is made with intention to claim and hold adversely." (p. 819.)

Previous decisions of the court were collated. The Kinne case has been cited with approval as late as 1932. (*Wiburg v. Stevenson,* 134 Kan. 530, 531, 7 P. 2d 512.)

Dyer relies on the decision in *Vandling v. Griffith,* 105 Kan. 477, 185 Pac. 23, in which the district court established a boundary, not the true boundary, because of recognition and acquiescence of adjoining proprietors. In that case, with knowledge or at least abundant reason to know of uncertainty of location of true line, resulting from discordant surveys, landowners accepted one of the surveys, and acted accordingly for years. We have no such case here.

The correctness of the survey of 1932 is not disputed. There is no occasion for another survey, and under the circumstances stated, the thirty-three-foot strip belongs to Scott.

The judgment of the district court with respect to tract K is affirmed. The judgment with respect to boundary between tracts I and J is reversed, and the cause is remanded with direction to quiet Scott's title to the thirty-three-foot strip.